|  |  |
|---|---|
| IN THE UNITED STATES DISTRICT COURT | |
| FOR THE NORTHERN DISTRICT OF CALIFORNIA | |

BRADLEY COOPER, Individually and on Behalf of all Others Similarly Situated; TODD LABAK,

    Plaintiffs,

  v.

THORATEC CORPORATION; GERALD F. BURBACH; TAYLOR C. HARRIS; and DAVID SMITH,

    Defendants.
_____/

No. 14-cv-0360 CW

ORDER GRANTING MOTION FOR CLASS CERTIFICATION

Plaintiffs Bradley Cooper and Todd Labak are investors in Thoratec Corporation, a medical device company that manufactures the HeartMate II. They allege that Thoratec and certain of its officers, Gerhard F. Burbach, Taylor C. Harris, and David V. Smith, made various misrepresentations in order to hide from its investors and the public that the HeartMate II's rates of thrombosis were increasing, which would have adversely affected the stock price of Thoratec. They bring this suit for damages on behalf of themselves and a putative class, alleging violations of Sections 20(a) and 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder. Now before the Court is Plaintiffs' Motion for Class Certification. For the reasons stated below, the Court grants Plaintiffs' motion.

## BACKGROUND

Thoratec is a medical device company that manufactures and markets a Ventricular Assist System (VAS), the HeartMate II. Second Amended Complaint (SAC) (Dkt. No. 49) ¶¶ 34-35. During the

relevant period between May 11, 2011 and August 6, 2014 (the Class Period), Thoratec's common stock traded on the NASDAQ Global Market under the ticker symbol "THOR." Id. ¶ 29. Individual defendants Burbach, Harris, and Smith were directors or officers of Thoratec during the Class Period.[1]

On April 21, 2008, HeartMate II received approval from the FDA for certain applications. SAC ¶ 41. The FDA published a summary of safety and effectiveness data for the HeartMate II, which demonstrated a two percent rate of thrombosis for all patients as of September 14, 2007. Id.

Thoratec was the sole manufacturer of VAS until the HeartWare VAS came on the European market in 2009, and reported thrombosis rates as low as 3.1 percent. SAC ¶¶ 48, 50. HeartWare earned FDA approval on November 12, 2012. Id. ¶ 52. It represented a serious threat to Thoratec's monopoly, especially because HeartWare had been disclosing decreasing rates throughout the Class Period. Id. ¶¶ 50-56. Defendants thus "knew that if they did not maintain thrombosis rates at the clinical trial rate of 2% that HeartWare would end up with the lion share of the market." Id. ¶ 57.

By 2011, Thoratec became aware of problems with rising thrombosis rates in patients receiving the HeartMate II. See, e.g., SAC ¶¶ 8, 88, 92, 142, 145, 165. Despite this, Defendants

---

[1] Specifically, Burbach was Thoratec's President and Chief Executive Officer during the Class Period, Harris was the Vice President and Chief Financial Officer beginning in October 11, 2012, and Smith was the Executive Vice President and Chief Financial Officer between December 2006 and July 2011. SAC ¶¶ 30-32.

2

made various false and misleading statements regarding the HeartMate II's thrombosis rates. On May 11, 2011, for example, Smith spoke at a health care conference and stated that HeartMate II's rates of thrombosis were between 0.02 and 0.03, the clinical trial rates, despite knowledge at that time that they had risen well above that level. Id. ¶¶ 90-92. The individual Defendants continued to make similar statements throughout the Class Period.

On November 27, 2013, external studies and articles published, including a study by the New England Journal of Medicine (NEJM), concluded that the occurrence of thrombosis associated with the HeartMate II had significantly increased, causing Thoratec stock to drop by approximately six percent. Id. ¶¶ 128-29. Thoratec hid from its investors its own internal data confirming such reports and the related financial risk, and did not correct its prior disclosures. Id. ¶ 129. Thoratec did not disclose the extent of the impact that the reported increases had on HeartMate II's commercial viability until August 6, 2014, causing its stock to drop some twenty-five percent. Id. ¶¶ 166-68.

Plaintiffs Cooper and Labak are investors in Thoratec stock who purchased shares on July 15, 2013 and August 2, 2013, respectively. See Goldberg Decl. Ex. B (Movant Certification) (Dkt. No. 12-2); SAC ¶ 27. They move for certification of the following class:

> all persons or entities that purchased or otherwise acquired the common stock of Thoratec Corporation between May 11, 2011 and August 6, 2014, both dates inclusive. Excluded from the Class are any parties who are or have been Defendants in this litigation, the present and former officers and directors of Thoratec and any subsidiary thereof, members of their immediate families and their legal representatives, heirs,

3

successors or assigns and any entity in which any current or former Defendant has or had a controlling interest.

Mot. at ii.

## LEGAL STANDARD

Plaintiffs seeking to represent a class first must satisfy the threshold requirements of Rule 23(a). Rule 23(a) provides that a case is appropriate for certification as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs must also meet the requirements of one of the subsections of Rule 23(b). In this motion, Plaintiffs seek certification pursuant to Rule 23(b)(3), which permits certification where common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are intended "to cover cases 'in which a class action would achieve economies of time, effort, and expense . . . without sacrificing procedural fairness or bringing about other undesirable results." Amchem Prods. v. Windsor, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3) adv. comm. notes to 1966 amendment).

4

Plaintiffs seeking class certification bear the burden of demonstrating that they satisfy each Rule 23 requirement at issue. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158–61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977). The court must conduct a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011) (internal quotation marks omitted). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." Id. at 2551. "Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013). This determination is committed to the district court's discretion. Califano v. Yamasaki, 442 U.S. 682, 703 (1979).

DISCUSSION

I. Plaintiffs Meet Rule 23(a)'s Requirements, Including Adequacy

Defendants do not dispute that Plaintiffs have satisfied Rule 23(a)'s requirements of numerosity, commonality, and typicality, and instead focus only on adequacy. They argue that Plaintiffs are not adequate class representatives because they purchased shares only prior to November 27, 2013, and thus have no incentive to pursue claims on behalf of post-November 27, 2013 investors. In order to establish adequacy under Rule 23(a)(4), named plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To

determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Ellis v. Costco Wholesale Corp., 657 F.3d 970, 985 (9th Cir. 2011) (internal quotation marks omitted).

Defendants contend that investors who purchased stock after the November 27, 2013 publications could not have relied on the May 11, 2011 misrepresentation that thrombosis rates had not increased above the clinical trial rates of two to three percent. Because neither Labak nor Cooper purchased shares after November 27, 2013, they have no incentive to pursue vigorously the divergent claims of "post-publication" investors. As discussed further below, Defendants continued to make misrepresentations about thrombosis rates after the November 27, 2013 publications and undermined the studies' conclusions. Because class members who purchased both before and after may rely on the same theory of liability, there are no divergent claims, and Labak and Cooper are adequate class representatives.

Because Labak and Cooper are adequate class representatives and Defendants do not dispute the other factors, Plaintiffs have met Rule 23(a)'s requirements.

II. Plaintiffs Meet Rule 23(b)(3)'s Requirements, Including Predominance

Defendants most vigorously argue that Plaintiffs cannot show predominance for two reasons. First, they argue that Plaintiffs cannot rely on a presumption of reliance because they fail to show

front-end price impact.  Second, they argue that Plaintiffs have not demonstrated that damages are measurable on a class-wide basis.  Neither of Defendants' arguments is successful.

### A. Plaintiffs Sufficiently Allege Reliance Based on the Fraud-on-the-Market Theory

In order to bring a claim under Section 10(b), "the plaintiff must show individual reliance on a material misstatement." Hanon v. Dataproducts Corp., 976 F.2d 497, 506 (9th Cir. 1992).  "The reliance element 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 488 (2013)).

In Basic Inc. v. Levinson, 485 U.S. 224 (1988), the Supreme Court created a rebuttable presumption of reliance based on the "fraud-on-the-market" theory, which holds that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." Id. at 246.  This presumption recognizes that "the typical investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price--the belief that it reflects all public, material information." Halliburton, 134 S. Ct. at 2408 (internal quotation marks omitted).  "As a result, whenever the investor buys or sells stock at the market price, his reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." Id. (internal quotation marks omitted).

7

In order to establish the Basic presumption, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton, 134 S. Ct. at 2408. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." Basic, 485 U.S. at 248. For example, "evidence that the misrepresentation did not in fact affect the stock price" may be sufficient to rebut the presumption at the class certification stage. Halliburton, 134 S. Ct. at 2414. It is Defendants' burden to show lack of price impact. See id. at 2417; Hatamian v. Advanced Micro Devices, Inc., No. 14-cv-00226 YGR, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016).

> 1. Defendants' Argument of Lack of Price Impact With Respect to the May 11, 2011 Alleged Misrepresentation Fails

Defendants argue that there was a lack of price impact, and thus Plaintiffs may not rely on the Basic presumption. In order to show price impact, Plaintiffs submit the expert report of Dr. Zachary Nye, who studied Thoratec common stock "to determine whether new material corporate events or financial releases promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects." See Ludwig Decl. Ex. 1 (Nye Report) (Dkt. No. 99-1) at ¶¶ 51-55. His analysis concludes "(i) that a strong cause-and-effect

8

relationship existed between the information disclosed on the events dates and resulting stock price movements; and (ii) that the direction of the Company-specific return on event dates is consistent with the information disclosed." Id. ¶ 54.

Defendants contend in opposition that Dr. Nye's analysis actually demonstrates that there was no statistically significant increase in Thoratec's stock price on May 11, 2011, the date that Smith made the first allegedly false and misleading statement. See Nye Report Ex. 11A at 1. Dr. Nye admitted as much at his deposition, and Defendants' expert, Dr. Allen Ferrell, conducted an analysis confirming the same. See Rawlinson Decl. Ex. 2 (Nye Dep. Tr.) (Dkt. No. 107-2) at 104:8-17; Rawlinson Decl. Ex. 1 (Farrell Report) (Dkt. No. 107-1) at ¶ 26. Defendants argue that this constitutes direct evidence that the alleged misrepresentation did not actually affect the stock's market price, and that Plaintiffs had not contended and cannot contend for the first time on reply that they are instead alleging a price maintenance theory.

Defendants' argument that Plaintiffs fail to allege a price maintenance theory is not well-taken. A fair reading of the SAC shows that Plaintiffs allege that Thoratec's claimed misrepresentations led investors to believe that the HeartMate II was reporting thrombosis rates consistent with the clinical trials--e.g., that the product was maintaining the status quo. Had Thoratec admitted that thrombosis rates were actually higher, HeartMate II would not have been able to maintain its competitive position in relation to HeartWare, and Thoratec's stock price would not have remained afloat. Thus, that Smith's May 11, 2011

9

statement did not lead to any significant increase in stock price is entirely consistent with Plaintiffs' theory that this misrepresentation prolonged the artificial inflation of Thoratec's stock price. See, e.g., In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 259 (2d Cir. 2016) ("[W]e agree with the Seventh and Eleventh Circuits that securities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation."); FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1310 (11th Cir. 2011) ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information—-or information already known by the market-—will not cause a change in the stock price."); Schleicher v. Wendt, 618 F.3d 679, 683 (7th Cir. 2010) ("[W]hen an unduly optimistic statement stops a price from declining (by adding some good news to the mix): once the truth comes out, the price drops to where it would have been had the statement not been made."); see also Ludwig Decl. Ex. 1 (Farrell Dep. Tr.) (Dkt. No. 113-1) at 52:3-6 ("Q. Would one necessarily expect the price of the security to increase when a material false statement is reiterated to the market? A. No."), 53:13-20 ("Q. So, generally speaking, can price inflation exist during a class period when alleged misrepresentations do not coincide with significant price increases? A. It's possible.").[2] Defendants' proffered evidence of lack of price impact is irrelevant to Plaintiffs' theory, which

---

[2] Because the plaintiff in In re Finisar Corp. Sec. Litig., No. 5:11-cv-01252-EJD, 2017 WL 6026244, at *8 (N.D. Cal. Dec. 5, 2017), was "not proceeding on a price maintenance theory," that case is inapposite.

10

is that the May 11, 2011 event would not have impacted Thoratec's stock price by raising it, but rather prolonged its inflation.

Defendants' argument that Plaintiffs do not show that the May 11, 2011 statement "maintained" the price at a level already inflated from some earlier misstatement has also been considered and rejected by various courts. See, e.g., Vivendi, 838 F.3d at 259 ("[T]heories of 'inflation maintenance' and 'inflation introduction' are not separate legal categories.") (internal quotation marks and citation omitted); Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 418 (7th Cir. 2015) (same). This Court finds the reasoning in those cases persuasive and agrees that Plaintiffs here not need not allege separate theories of inflation introduction and inflation maintenance.

### 2. Defendants Do Not Show Lack of Price Impact With Respect to Corrective Disclosures

Defendants next argue that the alleged corrective disclosures also fail to show price impact (1) because of the September 6, 2013 disclosure to the market and (2) because they were not "corrective" of the May 11, 2011 misrepresentation. Defendants do not dispute that on the dates of each of the corrective disclosures alleged in the SAC, Thoratec's stock price saw statistically significant declines, -6.81 percent on November 27, 2013, and -29.65 percent on August 6, 2014, according to their own expert. See Farrell Report at ¶¶ 34, 38; accord Nye Report Ex. 11A at 18, 23.

On September 6, 2013, the Interagency Registry for Mechanically Assisted Circulatory Support (INTERMACS) published its Initial Analyses indicating that since 2011, the thrombosis

11

rate associated with the HeartMate II had increased beyond the pre-approval clinical trial rate of two to three percent. See Farrell Report Ex. C. There was no accompanying decline in the price of Thoratec stock. This Initial Analyses as submitted by Defendants, however, is a one-page web document that lists no authors and is not a published study. Indeed, Plaintiffs contend that it was merely web-published for physicians. The document also states, "Note the significant increase in events after May, 2011, but the magnitude of increase was relatively small." Id.

The Court agrees with Plaintiffs that this document is insufficient to establish that the market already knew of the increased thrombosis rates associated with the HeartMate II prior to the November 27, 2013 corrective disclosure. It is merely an initial analysis by INTERMACS, not a peer-reviewed, published study, undermining its authority on the topic. Moreover, the document itself notes that while its numbers show a "significant increase," the absolute "magnitude" of that increase was "relatively small," dampening the overall impact of the analysis. Farrell Report Ex. C. It is not surprising that, even if this document had some viewership, it would not result in a meaningful impact on the stock price because of its lack of authority and cabined suggestion of increased rates of thrombosis. The INTERMACS analysis is insufficient to sever the link between the May 11, 2011 misrepresentation and the corrective disclosures.

Defendants' second theory is that neither the November 27, 2013 publications nor the August 6, 2014 announcement was "corrective" of the May 11, 2011 alleged misrepresentation because they did not disclose new information previously unknown to the

12

market, nor did the information disclosed in the August 6, 2014 announcement match the specific alleged misrepresentation on May 11, 2011.

With respect to Defendants' argument that the November 27, 2013 publication did not disclose any new information, this argument fails for the same reasons that the September 6, 2013 "disclosure" argument fails. While Defendants point to analyst reports that suggest that increase in thrombosis rates was not unknown to the market prior to the November 27, 2013 publications, Defendants do not dispute that there were no peer-reviewed, published studies that confirmed these increases with scientific authority. The November publications for the first time offered evidence linking the HeartMate II to higher thrombosis rates, and the market responded accordingly.

Plaintiffs also present a plausible theory, and sufficient evidence, that the August 6, 2014 announcement disclosed new information, even when considering the November 27, 2013 disclosures. Plaintiffs' SAC is rife with examples of the individual Defendants making misrepresentations about the thrombosis rates of increase, undermining the November 27, 2013 publications, misstating they had new clinical data exhibiting lower rates of increase when they did not, and omitting the impact of the increased rates on revenues. See, e.g., SAC ¶¶ 138, 140, 143, 146, 149, 151, 154, 156, 159, 162. These statements could have reasonably misled investors to doubt the November 27, 2013 publications and instead believe that Thoratec's rates of thrombosis were stable and no longer increasing, or even lower than suggested by the earlier publications.

13

Defendants' argument that the information disclosed in the August 6, 2014 announcement did not "match" the specific alleged misrepresentation on May 11, 2011, on the other hand, deserves more scrutiny. Plaintiffs allege that in the August 6, 2014 statement, Defendants disclosed missed earnings and revenues due to concern over high thrombosis rates, lowered 2014 guidance, and disclosed a label change. SAC ¶¶ 166-67. Burbach issued a statement on that date explaining that the November 27, 2013 publications "along with greater scrutiny of clinical outcomes overall continues to be the largest factor impacting our business on a worldwide basis" and growth in overall referrals was down. Id. at 166. Burbach explained, "While we expect that this would be a headwind during the first half of the year is [sic] now clearly the impact is persisting longer than expected. Id.

Defendants contend that these statements do not "match" earlier alleged misrepresentations because they do not reveal any fact known to Thoratec at the time of the May 11, 2011 statement, nor the earlier statements regarding 2014 guidance. Instead, these statements dealt only with the impact of the November 27, 2013 publications on the second half of 2014. Nor did the announced "label change" correct any earlier misstatement.

While this is Defendants' strongest argument, Defendants' statements in the period between November 27, 2013 and August 6, 2014 can reasonably be read to suggest that the impact of the November 2013 publications on implanting physicians (and therefore Thoratec's bottom line) would be minimal. Thus, Thoratec's August 2014 disclosure that the publications had in fact substantially impacted earnings and revenues corrected the earlier misleading

14

statements, causing Thoratec's stock immediately to drop a significant amount. Plaintiffs also argue that Thoratec's purpose since May 11, 2011 was to hide the effect of the increased thrombosis rates on the company's financials, which did not come to light until August 6, 2014. While the Court is concerned about a sufficient link between the May 11, 2011 misrepresentations and the August 6, 2014 statement, Plaintiffs may proceed on their theory at this early stage. In the future, a subclass based on the misrepresentations made in 2013 and the August 2014 disclosure may be appropriate.

Because the Court concludes that Defendants continued to make material misrepresentations after the November 27, 2013 publications, and Plaintiffs may proceed on their August 24, 2014 corrective disclosure theory as well, Defendants' alternative requests to end the Class Period on November 27, 2013 or to create subclasses are denied at this time without prejudice.

B. Damages

As part of the predominance inquiry, Plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013). "Calculations need not be exact," id. at 35, nor is it necessary "to show that [the] method will work with certainty at this time," Khasin v. R.C. Bigelow, Inc., No. 12-cv-02204-WHO, 2016 WL 1213767, at *3 (N.D. Cal. Mar. 29, 2016). Furthermore, the Ninth Circuit has stated that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013).

15

Plaintiffs argue that damages can be calculated through an event study like that provided by their expert, Dr. Nye, which quantifies Thoratec's per share price decline upon disclosure of the fraud. Indeed, "[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." In re Diamond Foods, Inc. Sec. Litig., 295 F.R.D. 240, 251 (N.D. Cal. 2013) (citing In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003)).

Defendants argue that this methodology is insufficient because it fails to take into consideration what Defendants characterize as competing sets of misrepresentations. For the same reasons that the Court rejected Defendants' arguments regarding the November 27, 2013 publication date, this argument too fails. The Court concludes that Plaintiffs have sufficiently shown, at this stage, that damages are capable of measurement on a classwide basis.

For these reasons, Plaintiffs have satisfied Rule 23(b)(3)'s requirements.

## CONCLUSION

Because Plaintiffs have satisfied the requirements of Rules 23(a) and 23(b)(3), Plaintiffs' Motion for Class Certification is granted.

IT IS SO ORDERED.

Dated: May 8, 2018

CLAUDIA WILKEN
United States District Judge